UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Case No. 12-47106

SCOTT R. SCHUBINER,                                       Chapter 7

                              Debtor.                     Judge Thomas J. Tucker
_____/

STEVEN P. SCHUBINER, etc.,

                              Plaintiff,

v.                                                        Adv. No. 17-4677

SHELLEY ZOLMAN,

                              Defendant.
_____/

**OPINION REGARDING CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS
OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

## I. Introduction

The parties in this adversary proceeding ask the Court to decide, among other things,

whether a particular obligation in a prenuptial agreement made by the Debtor, Scott R.

Schubiner, is a "domestic support obligation" within the meaning of Bankruptcy Code

§ 101(14A), and thereby is nondischargeable in the Debtor's Chapter 7 bankruptcy case, under

Bankruptcy Code § 523(a)(5).

Scott R. Schubiner ("Scott") and Shelley Zolman ("Shelley") made a prenuptial

agreement (referred to in this Opinion as the "Antenuptial Agreement") in 2010, a few days

before they were married. Scott later filed a Chapter 7 bankruptcy case, in 2012, and obtained a

discharge. A few years later, in 2017, Scott died. A dispute then arose under the Antenuptial

Agreement, which led Shelley to file an action in state probate court. In that action, Shelley sought damages of $500,000 for Scott's alleged breach of an obligation relating to life insurance, contained in the Antenuptial Agreement. Shelley's filing of that state court action, in turn, led the personal representative of Scott's probate estate, Steven P. Schubiner (the "Plaintiff"), to file this adversary proceeding against Shelley. Plaintiff claims, among other things, that Shelley's state court action violated the discharge injunction under 11 U.S.C. § 524(a)(2), because Scott's alleged obligation at issue was discharged in Scott's bankruptcy case.

This adversary proceeding is before the Court on cross-motions for judgment on the pleadings, regarding the Plaintiff's first amended complaint (Docket # 19), or alternatively, for summary judgment (Docket ## 22, 27, collectively, the "Motions"). The Court held a hearing on the Motions and took them under advisement. This Opinion and the Order to follow will constitute the Court's decision on the Motions.

The Court will consider the Motions under applicable summary judgment standards, rather than under the standard that applies to a motion for judgment on the pleadings, because the Court has considered materials outside the pleadings. These include the affidavits of Shelley and of Plaintiff, and all of the other exhibits filed in support of and in opposition to the Motions.

For the reasons stated in this Opinion, the Court concludes that it cannot grant summary judgment for either party on the issue of whether the alleged debt owing by Scott to Shelley under the Antenuptial Agreement is nondischargeable under 11 U.S.C. § 523(a)(5), and therefore was not discharged in Scott's Chapter 7 bankruptcy case. As a result, the Court cannot grant summary judgment for either party on the issue of whether Shelley violated the discharge injunction by filing the action in the state probate court, seeking to collect such debt.

2

The Court also concludes, however, that Shelley does not have any valid claim based on the Antenuptial Agreement, and the Court will grant summary judgment for Plaintiff to that extent. Finally, under the particular circumstances of this case, the Court will exercise its discretion to deny Plaintiff any monetary or other relief for the alleged violation of the discharge injunction, and will grant summary judgment for Shelley to that extent.

The Court will enter an order granting each party's motion for summary judgment in part. The Court's Order will fully dispose of this adversary proceeding.

## II. Undisputed Facts

The undisputed facts include the following:

### A. The Antenuptial Agreement

On February 11, 2010, shortly before their marriage, Scott and Shelley entered into the Antenuptial Agreement.[1] The agreement is quoted at length below. In summary, the agreement specifically defined the "Separate Property" of Scott and Shelley, and provided that Scott and Shelley each would retain their "Separate Property" during their marriage, upon any divorce, or upon the death of either of them. The agreement further defined "Marital Property," as property acquired by Scott and Shelley during their marriage that was not part of the "Separate Property" of either of them. The agreement provided that upon a divorce, Scott and Shelley each would receive one-half of the Marital Property. Finally, the agreement provided, with certain conditions, that Scott and Shelley each would name the other as beneficiary under certain term life insurance policies.

---

[1] A copy of the Antenuptial Agreement is attached to the Plaintiff's first amended complaint (Docket # 19) as Exhibit A.

Specifically, the Antenuptial Agreement provided, in relevant part:

RECITALS:

A.   The parties are about to marry.  Both Scott and Shelley have been previously married (but not to each other).

B.   In anticipation of the solemnization of their marriage, **Scott and Shelley desire to define their respective rights in and claims against the Separate Property which each is bringing into this marriage.**

C.   Both Scott and Shelley feel that incorporating their understanding into a written document at this time is in their best interests and that of their respective heirs, and each agree that the provisions of this Agreement are accepted instead of any other rights or claims which each might have against the other or the other's estate.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

I.  ACKNOWLEDGMENTS
. . . .

4.   Scott and Shelley understand that, in the absence of this Agreement, each would have substantial rights as the **divorcee or survivor of the other**, and believe that it would be conducive to the harmony, success and strength of their planned marriage to execute this Agreement so that they may devote their full attention to the success, growth and enjoyment of their marriage, and the purpose of this Agreement is to waive and/or bar all such valuable rights which each would otherwise enjoy **as the divorcee or survivor of the other**, except as provided in this Agreement.
. . . .

II.  DEFINITIONS

1.   When the term "Scott's Separate Property" or "his Separate Property" is used in this Agreement, it shall mean: (a) all of the property listed on the attached Exhibit A; (b) all of the property transferred to him by gift, bequest or otherwise by family members or friends; (c) all of the proceeds from the sale or other

4

disposition of any of such property including any accretions, additions, dividends, substitutions, businesses, successor entities, partnerships, etc.; and (d) all Income therefrom; and Scott shall have the absolute and unrestricted right to dispose of his Separate Property, free from any claim that may be made by Shelley by reason of their marriage, and with the same effect as if no marriage had been consummated between them.

2. When the term "Shelley's Separate Property" or "her Separate Property" is used in this Agreement, it shall mean: (a) all of the property listed on the attached Exhibit B; (b) all of the property transferred to her by gift, bequest or otherwise by family members or friends; (c) all of the proceeds from the sale or other disposition of any such property including accretions, additions, dividends, substitutions, businesses, successor entities, partnerships, etc.; and (d) all Income therefrom; and Shelley shall have the absolute and unrestricted right to dispose of her Separate Property, free from any claim that may be made by Scott by reason of their marriage, and with the same effect as if no marriage had been consummated between them.
. . . .

5. The term "Marital Property" is defined as any property acquired by Scott and Shelley after the marriage which is not part of their respective Separate Property and shall include all Income therefrom.
. . . .

III. <u>SEPARATE PROPERTY AFTER MARRIAGE</u>

1. After the marriage, Scott shall retain all rights in Scott's Separate Property.

2. After the marriage, Shelley shall retain all rights in Shelley's Separate Property.
. . . .

4. Scott and Shelley shall be free to commingle their Separate Property in the same investment without the property losing its status as Separate Property. Scott and Shelley shall also be free to title their Separate Property or Marital Property in joint name with rights of survivorship or as tenants by the entireties; provided, however, in the event of the death of one of them, such

5

property shall pass to the survivor of them by operation of law, notwithstanding anything in this Agreement to the contrary.

5. Notwithstanding the provisions of this Agreement, Scott and Shelley shall each have the right to transfer or convey to the other any property or interest therein which may be lawfully conveyed or transferred during his or her lifetime or by Will or otherwise upon death. Neither Scott nor Shelley intends by this Agreement to limit or restrict in any way the right and power to receive any such transfer or conveyance, and any such transfer or conveyance shall be deemed to be a waiver of any provision of this Agreement.

IV. <u>DIVORCE AND DEATH PROVISIONS</u>

Scott and Shelley each agree that, **in the event of the divorce or death of either of them** during their marriage to each other:

1. Scott waives and releases all rights and interest, statutory or otherwise, including, but not limited to, alimony, dower, curtesy, homestead allowance, family allowance, statutory allowance, exempt property, intestate distribution and right of election to take against the Will of Shelley, which he may acquire or be entitled to as the husband, widower, heir-at-law, next-of-kin or distributee of Shelley, in any and all of Shelley's Separate Property.

2. Shelley waives and releases all rights and interest, statutory or otherwise, including, but not limited to, alimony, dower, curtesy, homestead allowance, family allowance, statutory allowance, exempt property, intestate distribution and right of election to take against the Will of Scott, which she may acquire or be entitled to as the wife, widow, heir-at-law, next-of-kin or distributee of Scott, in any and all of Scott's Separate Property.

3. **If Scott and Shelley divorce**, Scott and Shelley shall each receive one-half of the Marital Property. Scott and Shelley shall each retain their respective interests in their Separate Property with no claims by the other.

**4. Shelley shall, as soon as practicable after the marriage, apply and pay for at least $500,000.00 of 30 year**

6

**level term life insurance naming Scott's Revocable Trust as
beneficiary. Scott shall assign an equivalent amount of his
present life insurance policy(ies) naming Shelley as beneficiary
as soon as practicable after marriage.**[2]

## B. Scott's and Shelley's financial positions and plans at the time of their marriage

Scott's "Separate Property" is listed specifically on Exhibit A of the Antenuptial

Agreement, and Shelley's "Separate Property" is listed specifically on Exhibit B of the

Antenuptial Agreement. At the time of the execution of the Antenuptial Agreement, according to

Exhibit A of that agreement, Scott had a net worth of –$10,136.00. Included in Scott's list of

assets were two life insurance policies: one life insurance policy from "Electric Capital

Assurance Company in the face amount of $1,000,000.00;" and another life insurance policy

from "Penn-Pacific Life Insurance Co. in the face amount of $400,000.00."[3]

At the time of executing the Antenuptial Agreement, according to Exhibit B of that

agreement, Shelley had a net worth of $808,678.62.[4] The bulk of Shelley's assets had come from

a settlement of a personal injury claim she had as a result of serious injuries she suffered in a car

accident in 2003.[5]

Shelley was a dentist at the time of executing the Antenuptial Agreement. She worked

part time as an adjunct faculty member at the University of Detroit Dental School.[6] Her accident

---

[2] Antenuptial Agreement at 1-4 (emphasis added).

[3] *Id*. at pdf. p. 26.

[4] *See id.* at pdf. pp. 27-33.

[5] *See* Aff. of Shelley (Ex. 1 to Docket # 22) at ¶ 4.

[6] *Id.* at ¶ 5.

7

injuries prevented her from working full time at the Dental School or as a dentist in a private practice. Scott was working as an attorney for the law firm of Jacob & Weingarten, P.C., earning more than three times the income of Shelley.[7] This was so even though Scott had long suffered from multiple sclerosis.

An attorney at Scott's law firm drafted the Antenuptial Agreement, though Scott and Shelley each were represented by their own attorneys. At the time of the preparation and signing of the Antenuptial Agreement, Scott and Shelley intended to use the funds from Shelley's settlement for a down payment on a house and renovations on that house.[8] Shelley's understanding of the intent behind the life insurance provisions in Paragraph IV.4 of the Antenuptial Agreement was "to insure that in the event of Scott's death, he would be able to provide maintenance and support for [Shelley] so that [she] would continue to live in the manner in which the two of [them] had grown accustomed and vice versa."[9] In other words, "[P]aragraph IV.4. of the Agreement was intended to make sure that in the event of either of [Scott's or Shelley's] deaths, the other would be provided with maintenance and support through insurance proceeds so that the survivor would be able to continue to live in the house and not be forced to sell it for support."[10]

At the time the parties signed the Antenuptial Agreement, Scott had the two life insurance policies described above, which he had purchased before meeting Shelley. The beneficiary of

---

[7] *Id.* at ¶¶ 1, 5.

[8] *Id.* at ¶ 7.

[9] *Id.* at ¶ 6.

[10] *Id.* at ¶ 7.

8

those life insurance policies was the Scott Schubiner Revocable Trust (the "Trust"). The sole beneficiary of the Trust is Scott's minor daughter. Scott's father paid the premiums for the life insurance policies.[11]

## C.  Events after Scott and Shelley married

Scott and Shelley were married on February 17, 2010, six days after they signed the Antenuptial Agreement. Scott was Shelley's second husband, and Shelley was Scott's third wife.[12] Scott had one minor child from a prior marriage, and Shelley had three minor children from her prior marriage.

On the date they were married, Scott and Shelley purchased a home in Bloomfield Hills, Michigan, using the money Shelley had received from the settlement of her personal injury claim. They later made renovations to that home, also using funds from Shelley's settlement. In 2013, Scott and Shelley sold the Bloomfield Hills home and bought a home in Huntington Woods, Michigan. They financed the purchase of that home, and renovations to that home, with funds from Shelley's settlement.[13]

Meanwhile, on March 22, 2012, Scott had filed a voluntary bankruptcy petition under Chapter 7. It was a "no asset" case, meaning that the Chapter 7 Trustee did not administer any assets, and nothing was paid to creditors. On July 3, 2012, the Court entered an order granting Scott a discharge under 11 U.S.C. § 727,[14] and on August 1, 2012, Scott's bankruptcy case was

---

[11] Aff. of Steven P. Schubiner (Ex. 5 of Docket # 27) at ¶¶ 15-18.

[12]  Aff. of Shelley at ¶ 2.

[13]  *Id.* at ¶ 7.

[14]  *See* Docket # 23 in Case No. 12-47106.

9

closed.

On November 8, 2013, Scott terminated his employment at Jacob & Weingarten, P.C., due to his multiple sclerosis. "[A]fter a waiting period, [Scott] began receiving disability payments."[15]

Unfortunately, Scott died unexpectedly on April 22, 2017, at the age of 51.[16] At the time of Scott's death, Shelley had not applied for and paid for the life insurance described in Paragraph IV.4 of the Antenuptial Agreement — *i.e.*, "at least $500,000.00 of 30 year level term life insurance naming Scott's Revocable Trust as beneficiary." Likewise, Scott had not named Shelley as a beneficiary on either of his life insurance policies, as provided under Paragraph IV.4 of the Antenuptial Agreement.

**D. The dispute in the probate court**

A decedent's estate for Scott was opened in the probate court for Oakland County, Michigan (Case No. 17-376753-DE.). On July 18, 2017, Shelley filed a complaint in the probate court (the "Probate Court Lawsuit"), against Steven P. Schubiner, who had been appointed the Personal Representative of Scott's estate, and who is also Scott's brother and the Trustee of the Trust (Case No. 17-377846-CZ).[17] Steven Schubiner also is an attorney, and worked at the law firm where Scott had worked.

Shelley's complaint in the Probate Court Lawsuit is based on Scott's unperformed obligation under Paragraph IV.4 of the Antenuptial Agreement. The complaint alleges that "[o]n

---

[15] Aff. of Steven P. Schubiner (Ex. 5 of Docket # 27) at ¶¶ 4, 12.

[16] Aff. of Shelley at ¶ 1.

[17] A copy of that complaint is attached as Exhibit 4 to Docket # 25.

10

May 18, 2017, Shelley's counsel contacted Defendant [Steven P. Schubiner] and verbally conveyed Shelley's claim against the first $500,000 of Scott's life insurance proceeds; however, Defendant, while acting in his capacity as Personal Representative and Trustee, denied the claim."[18]  The complaint alleged further that "[o]n May 26, 2017, Shelley's counsel sent Defendant written confirmation of Shelley's claim and Defendant['s] subsequent unequivocal denial."[19]  The complaint sought "damages in the amount of $500,000, plus costs, interest, and allowable attorney fees."[20]  The complaint also sought the imposition of "a constructive trust over the life insurance proceeds in the amount of $500,000" and the prohibition of "any use of these funds until a final order has been issued in [the Probate Court Lawsuit]."[21]

## E.  This adversary proceeding

On August 30, 2017, Steven P. Schubiner, as the Personal Representative of Scott's probate estate, filed a motion to reopen Scott's bankruptcy case.[22]  The motion sought to reopen the case for the purpose of having this Court determine (1) if any debt arising out of Scott's obligation under the Antenuptial Agreement, to name Shelley as a beneficiary of $500,000 in life insurance proceeds, was discharged in Scott's Chapter 7 bankruptcy case; (2) whether Shelley violated the discharge injunction by filing the Probate Court Lawsuit; and (3) whether Plaintiff

---

[18]  Compl. in Probate Court Lawsuit (Ex. 4 to Docket # 25) at 2 ¶ 11.

[19]  *Id.* at 2 ¶ 12.

[20]  *Id.* at 3 ¶ B.

[21]   *Id.* at 3 ¶ A.

[22]  Docket # 27.

11

was entitled to an award of sanctions for Shelley's violation of the discharge injunction.[23] Shelley filed a response to the motion to reopen agreeing that the "case should be reopened so that this Court can determine the dischargeability of Debtor's obligations to [her] under the prenuptial [a]greement,"[24] and then stipulated to the reopening of the case.[25] On September 20, 2017, the Court entered an order reopening Scott's bankruptcy case.[26]

On September 22, 2017, Steven P. Schubiner ("Plaintiff") filed this adversary proceeding against Shelley.[27] Plaintiff's operative complaint is his first amended complaint, filed December 21, 2017,[28] which contains five counts. Count I requests a determination that Section IV, Paragraph 4 of the Antenuptial Agreement was rejected in Scott's bankruptcy case, under 11 U.S.C. § 365(d)(1). Count III requests a determination of the value of Shelley's "rejection claim," and determine that the value of Shelley's claim is "zero dollars." Count II requests a determination that Scott's alleged contractual obligation under the Antenuptial Agreement was not a domestic support obligation and was discharged in Scott's bankruptcy case. Count IV requests enforcement of the discharge injunction under 11 U.S.C. § 524(a)(2). Count V requests a determination that Shelley is in contempt for her violation of the discharge injunction, and seeks an order awarding Plaintiff sanctions for Shelley's violation of the discharge injunction.

---

[23] *See* Mot. to Reopen (Docket # 27) at ¶¶ 7, 16.

[24] Shelley's Response to Mot. to Reopen (Docket # 28).

[25] *See* "Stipulation for Entry of Order to Reopen Case" (Docket # 31).

[26] Docket # 32.

[27] Docket # 1.

[28] Docket # 19.

Both parties now seek summary judgment on Plaintiff's first amended complaint.

## III. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding, under 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(O).

In addition, this adversary proceeding falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen (In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, including Bankruptcy Code §§ 523(a)(5) and 524(a)(2). And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

For these reasons, this Court has *statutory* authority, under 28 U.S.C. § 157(b)(1), to enter a final judgment on all of Plaintiff's claims. If and to the extent this Court might otherwise lack *constitutional* authority to enter a final judgment, under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), such a problem does not exist in this case. This is because both of the parties have expressly, knowingly, and voluntarily consented to this bankruptcy court entering a final order or judgment, as permitted by 28 U.S.C. § 157(c)(2).[29] Given that consent, this bankruptcy court has both statutory and constitutional authority to enter a final judgment on Plaintiff's claims. *See*

---

[29] *See* Report of Parties' Rule 26(f) Conference (Docket # 11) at 3 ¶ 3(g).

13

*Ralph Roberts Realty, LLC v. Savoy* (*In re Ralph Roberts Realty*), 562 B.R. 144, 147-48 (Bankr.

E.D. Mich. 2016) *(*discussing, among other cases,  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.

Ct. 1932 (2015)); *Dery v. Karafa* (*In re Dearborn Bancorp, Inc.*), 583 B.R. 395, 400 (Bankr.

E.D. Mich. 2018).

**IV.  Summary judgment standards**

        This Court has previously described the standards governing a motion for summary

judgment, as follows:

> Fed.R.Civ.P. 56(a), applicable to bankruptcy adversary
> proceedings under Fed. R. Bankr. P. 7056, provides that a motion
> for summary judgment "shall" be granted "if the movant shows
> that there is no genuine dispute as to any material fact and the
> movant is entitled to judgment as a matter of law." *In Cox v.
> Kentucky Dep't of Transp.*, 53 F.3d 146, 149–50 (6th Cir.1995),
> the court elaborated:
>
>> The moving party has the initial burden of proving
>> that no genuine issue of material fact exists and that
>> the moving party is entitled to judgment as a matter
>> of law. To meet this burden, the moving party may
>> rely on any of the evidentiary sources listed in Rule
>> 56(c) or may merely rely upon the failure of the
>> nonmoving party to produce any evidence which
>> would create a genuine dispute for the [trier of fact].
>> Essentially, a motion for summary judgment is a
>> means by which to challenge the opposing party to
>> 'put up or shut up' on a critical issue.
>>
>> If the moving party satisfies its burden, then the
>> burden of going forward shifts to the nonmoving
>> party to produce evidence that results in a conflict
>> of material fact to be resolved by [the trier of fact].
>> In arriving at a resolution, the court must afford all
>> reasonable inferences, and construe the evidence in
>> the light most favorable to the nonmoving party.
>> However, if the evidence is insufficient to
>> reasonably support a . . . verdict in favor of the

14

nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.

. . .

Finally, the Sixth Circuit has concluded that, in the "new era" of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson* [v. *Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)], *Celotex* [*Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ] and *Matsushita* [*Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ], trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted.

*Id.* (internal quotation marks and citations omitted).  In determining whether the moving party has met its burden, a court must "believe the evidence of the nonmovant, and draw all justifiable inferences in favor of the nonmovant." *Ingram v. City of Columbus*, 185 F.3d 579, 586 (6th Cir.1999) (relying on *Russo v. City of Cincinnati*, 953 F.2d 1036, 1041–42 (6th Cir.1992)).

*McCallum v. Pixley* (*In re Pixley* ), 456 B.R. 770, 774–75 (Bankr. E.D. Mich. 2011).

Applying these standards, the Court will grant summary judgment in part for each of the parties, as described below.

## V. Discussion

## A.  Plaintiff's argument, that the Antenuptial Agreement was an "executory contract" that was "rejected" in Scott's Chapter 7 bankruptcy case, is immaterial.

15

Count I of Plaintiff's First amended complaint seeks a determination that the Antenuptial Agreement is an executory contract that is deemed rejected in Scott's bankruptcy case, under 11 U.S.C. § 365(d)(1). Count III seeks a determination that the value of Shelley's resulting "rejection claim" is zero. The Court declines to make these determinations, and instead will dismiss Counts I and III, for the following reasons.

Plaintiff argues that the effect of the purported deemed rejection of the Antenuptial Agreement is that Scott's obligation under that agreement to name Shelley as a beneficiary of $500,000 or more in life insurance coverage "did not survive [Scott's] bankruptcy proceeding."[30] The Court disagrees.

Even if the Antenuptial Agreement is an executory contract that is deemed rejected in Scott's bankruptcy case, such rejection has no impact on Shelley's claim against Scott under the Antenuptial Agreement. Nor does it have any impact on the dischargeability of any debt. As explained in *Sparks v. Sparks* (*In re Sparks*), 206 B.R. 481, 489 n.7 (Bankr. N.D. Ill. 1997) (citation omitted):

> Whether the debt arising from the rejection of an executory contract is dischargeable under section 523 . . . has no bearing whatsoever on whether it is rejectable under section 365. It is entirely possible under the law, . . . for [the individual Chapter 11 debtor] to reject the executory contract under section 365, but for the underlying debt to be non-dischargeable under section 523.

Under 11 U.S.C. § 365(a)(1), with certain exceptions, a Chapter 7 trustee, "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." Section 365(d)(1) states, in relevant part:

---

[30] *See* Pl.'s Reply Re: Pl.'s Mot. For Judgment on the Pleadings etc. (Docket # 57) at 4.

16

> (d)(1) In a case under chapter 7 of this title, if the trustee does not
> assume or reject an executory contract . . . within 60 days after the
> order for relief, or within such additional time as the court, for
> cause, within such 60-day period, fixes, then such contract . . . is
> deemed rejected.

11 U.S.C. § 365(d)(1).  The deemed rejection of an executory contract under § 365(d)(1) does not

terminate the contract.  *See In re Werbinski*, 271 B.R. 514, 517 (Bankr. E.D. Mich. 2001); *see*

*also In re Exec. Tech. Data Sys.*, 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987) ("'[R]ejection of an

executory contract . . . is not the equivalent of rescission. . . .'") (citation omitted); *Sparks*, 206

B.R. at 489 n.7 (Bankr. N.D. Ill. 1997) (citing *Cohen v. Drexel Burnham Lambert Grp., Inc.* (*In*

*re Drexel Burnham Lambert Grp., Inc.*), 138 B.R. 687, 711 (Bankr. S.D.N.Y 1992)) ("Rejection .

. . does not wipe out anything, but leaves the other party with the rights of a non-breaching party.

If a contract creates a non-dischargeable support obligation, the rejection of that contract does not

erase that obligation."); *In re Bergt*, 241 B.R. 17, 35 (Bankr. D. Alaska 1999) ("Rejection does

not 'nullify,' 'rescind,' or 'vaporize' the contract or terminate the rights of the parties[.]").

   In a Chapter 7 case, there are two effects of the deemed rejection of an executory contract

under § 365(d)(1).  First, the deemed rejection causes an abandonment of the bankruptcy estate's

rights under the contract, back to the debtor.  *See Werbinski*, 271 B.R. at 517.

   Second, the rejection gives the creditor the right to file a claim in the bankruptcy case.

"Pursuant to § 365(g)(1), the rejection is treated as a breach of the [contract] that took place

immediately prior to the filing of the bankruptcy petition."  *Miller v. Chateau Cmtys., Inc.* (*In re*

*Miller*), 282 F.3d 874, 877 (6th Cir. 2002) (citing *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re*

*Lavigne*), 114 F.3d 379, 387 (2d Cir. 1997)); *see also Sunbeam Prods., Inc. v. Chicago Am. Mfg.,*

*LLC*, 686 F.3d 372, 377 (7th Cir. 2012) ("What § 365(g) does by classifying rejection as breach

17

is establish that in bankruptcy, as outside of it, the other party's rights remain in place.").

Section 365(g)(1) provides, in relevant part:

> (g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract . . . of the debtor constitutes a breach of such contract . . . –
>
>> (1) if such contract . . . has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition[.]

11 U.S.C. § 365(g)(1). "The effect of the breach is to allow the party injured by the rejection to seek allowance of its resulting claim as a pre-petition unsecured claim." *Bank of Montreal v. Am. HomePatient, Inc.* (*In re Am. HomePatient, Inc.*), 414 F.3d 614, 617 (6th Cir. 2005). Section 502(g) of the Bankruptcy Code states, in relevant part:

> A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract . . . of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g)(1).

Generally, in a Chapter 7 case, an "unsecured creditor . . . must ["not later than 70 days after the order for relief"] file a proof of claim . . . for the claim . . . to be allowed." Fed. R. Bankr. P. 3002(a), 3002(c). However,

> [i]n a Chapter 7 no-asset case the court does not set a deadline for the filing of proofs of claim. Rather, the court may notify creditors that there are no assets, that it is not necessary to file claims, and that if sufficient assets become available for payment of a dividend, further notice will be given for filing of claims. *See* Fed. R. Bankr. P. 2002(e). Therefore, there is no date by which a proof of claim

18

must be filed to be "timely," and whenever a creditor receives notice or knowledge of the bankruptcy, he may file a proof of claim.

*Zirnhelt v. Madaj* (*In re Madaj*), 149 F.3d 467, 469 (6th Cir. 1998).

For purposes of this Opinion, the Court will assume that the Antenuptial Agreement was an executory contract. Scott filed his voluntary petition for relief under Chapter 7 on March 22, 2012, so under § 365(d)(1), the Chapter 7 Trustee had 60 days to assume or reject the Antenuptial Agreement. That deadline was May 21, 2012. When the Trustee did nothing by that deadline, the Antenuptial Agreement was deemed rejected. That deemed rejection gave Shelley the right to file a proof of claim for breach of the agreement. But there was never any deadline or reason for Shelley to file such a proof of claim, because Scott's bankruptcy case was always a no-asset case.

Because Scott's bankruptcy case was and is a no-asset case, and Shelley filed no proof of claim in the case, there is no reason for the Court to determine the value of what Plaintiff refers to as Shelley's "rejection claim," as requested by Count III of Plaintiff's First amended complaint.

For these reasons, the Court will dismiss Counts I and III of Plaintiff's First amended complaint.

**B. Shelley's claim under the Antenuptial Agreement is without merit.**

Plaintiff argues, among other things, that Shelley has no valid claim under the Antenuptial Agreement. This is based on the undisputed fact that during Scott's lifetime, Shelley never performed her obligation under the Antenuptial Agreement, in that she did not obtain life insurance of at least $500,000.00 (or in any amount) and name Scott's Revocable Trust as

19

beneficiary.  Because of this, Plaintiff argues, Scott never had an obligation under the

Antenuptial Agreement to name Shelley as beneficiary under Scott's term life insurance policies.

For this reason, Plaintiff argues, neither Scott nor his probate estate were or are liable for any

breach of the Antenuptial Agreement.  Shelley disputes this argument.

Plaintiff's no-liability argument initially was framed in this way: Shelley breached the

Antenuptial Agreement, by failing to perform her obligation, and this breach by Shelley excused

Scott from performing his obligation under the agreement.  This argument is based on the

following rule of contract law in Michigan:

> "The rule in Michigan is that one who first breaches a contract
> cannot maintain an action against the other contracting party for his
> subsequent breach or failure to perform."  However, the rule only
> applies if the initial breach was substantial.  To determine whether
> a substantial breach occurred, a trial court considers "whether the
> nonbreaching party obtained the benefit which he or she reasonably
> expected to receive."

*Able Demolition, Inc. v. Pontiac*, 739 N.W.2d 696, 701 (Mich. Ct. App. 2007) (citations

omitted).

Shelley disputes Plaintiff's argument.  She argues that her breach was not a "substantial"

breach, because she could cure her breach, and finally did cure her breach, after Scott's death, by

obtaining the required life insurance and naming Scott's Revocable Trust as a beneficiary.

Shelley argues it this way:

> "However the rule only applies if the initial breach was
> substantial."  *Able Demolition Inc. v City of Pontiac*, 275 Mich
> App 577 (2007).  A "substantial breach" is one which "has effected
> such a change in essential operative elements of the contract that
> further performance by the other party is thereby rendered
> ineffective or impossible, such as the causing of a complete failure
> of consideration or the prevention of further performance by the

20

other." *Id.* (citations omitted).

> In the present case, [Shelley's] failure to obtain the requisite life
> insurance for the benefit of Plaintiff did not constitute a
> "substantial breach" because it did not render further performance
> by Plaintiff ineffective or impossible. Furthermore, [Shelley's]
> breach was not material because, literally until the day she dies, she
> could cure the breach without negatively impacting Plaintiff's
> rights. Only upon either party's death (without the requisite life
> insurance) was it impossible for the breaching party to cure.
> Therefore, [Shelley's] delay in performance, did not negate her
> claim against Debtor's estate.[31]

During the hearing, Plaintiff's argument about Shelley's breach was framed somewhat

differently than as described above. At that point Plaintiff argued that Shelley's performance

under the Antenuptial Agreement — *i.e.*, her obtaining life insurance of at least $500,000 and

naming Scott's Revocable Trust as beneficiary — was a condition precedent to Scott's obligation

to name Shelley as a beneficiary under his life insurance policies. Shelley disputed this theory

during the hearing, arguing that this is inconsistent with the wording of the life insurance

provisions in the Agreement.

The Court concludes that the relevant wording of the Antenuptial Agreement is

unambiguous, and unambiguously means that Scott's contractual duty to name Shelley as a life

insurance beneficiary was never triggered. The Agreement's life insurance provisions, quoted

above, state:

> 4. Shelley shall, as soon as practicable after the marriage, apply
> and pay for at least $500,000.00 of 30 year level term life insurance
> naming Scott's Revocable Trust as beneficiary. Scott shall assign
> an equivalent amount of his present life insurance policy(ies)
> naming Shelley as beneficiary as soon as practicable after

---

[31] Def.'s Resp. to Pl.'s Mot. [etc.] (Docket # 37) at 22 (footnote omitted).

21

marriage.[32]

Under this language, Scott's contractual duty to assign and name Shelley as beneficiary of "an equivalent amount of his present life insurance policy(ies)," was the duty to make such assignment and beneficiary designation of an "equivalent amount" to the amount of life insurance that Shelley "appl[ied] and pa[id] for" naming Scott's Revocable Trust as beneficiary. The amount Shelley was to "apply and pay for" was not specifically defined, except that it was to be "at least $500,000.00." Because of this, the "equivalent amount" of life insurance that Scott had to assign to Shelley as beneficiary could not be known, until Shelley had first applied and paid for her life insurance. The most that could be known, before Shelley obtained her life insurance, was that the amount of Scott's life insurance obligation potentially could be somewhere in the range of $500,000.00 to $1.4 million, depending on how much insurance Shelley obtained. (The upper limit was $1.4 million because that was the amount of Scott's "present life insurance policy(ies)" at the time the parties entered into the Antenuptial Agreement.) If, for example, Shelley had obtained $800,000.00 of life insurance, Scott's life insurance obligation to Shelley would have been $800,000.00.

Thus, the actual amount of Scott's life insurance obligation to Shelley could not possibly be known until Shelley had first performed her life insurance obligation to Scott. And more importantly, Scott's only contractual obligation was to assign for Shelley's benefit an amount "equivalent" to the amount of life insurance that Shelley "appl[ied] and pa[id] for," for the benefit of Scott's Revocable Trust. Until Shelley applied and paid for her life insurance of at least $500,000, therefore, the "equivalent" amount that Scott was obligated to provide for Shelley

---

[32] Antenuptial Agreement 4 ¶ IV(4).

was *zero*.

Shelley therefore had to perform her obligation first, before Scott's obligation to assign *any* life insurance for Shelley could ever arise.

This conclusion is not altered by the fact that the Agreement required both Shelley and Scott to perform their life insurance obligations "as soon as practicable after marriage." Under that language, it was not practicable for Scott to perform his obligation until Shelley had first performed her obligation.

Shelley argues that the contract language means that Scott had an obligation to promptly name Shelley as beneficiary for $500,000.00, without waiting for Shelley to first perform, and then to increase that amount later if it turned out that Shelley obtained an amount higher than $500,000.00 in life insurance. But that clearly is not what the contract says. The contract clearly says only that Scott would assign an amount "equivalent" to what Shelley applied and paid for. During Scott's lifetime that amount in fact always was zero, because during Scott's lifetime Shelley never applied and paid for *any* life insurance, *in any amount*. What amount that would be, if Shelley ever did apply and pay for any life insurance, was unknown to Scott, and potentially could have been anywhere from $500,000.00 to $1.4 million.

If the parties had intended the meaning now argued by Shelley, the contract could have said so clearly, in any number of ways. For example, it could have said that "As soon as practicable after marriage, Scott shall assign $500,000.00 of his present life insurance policy(ies), plus any amount greater than $500,000.00 that Shelley obtains under this paragraph." That would have required Scott to assign $500,000.00 promptly, without waiting to see what amount of life insurance Shelley obtained. Including such language, or other language with the same

23

meaning, easily could have been done, if this had been the intended meaning of the parties. And this is what one would expect, especially since both Scott and Shelley were well-educated people, and each of them had the assistance of his/her own separate, chosen attorney in the drafting and negotiation of the Antenuptial Agreement.

In any event, the Court's interpretation of the contract language is the only reasonable meaning that can be given. Shelley's interpretation is contrary to the unambiguous meaning of the contract.

Under Michigan law, the question whether terms of a contract are ambiguous is a question of law for the court. *See Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193 (Mich. 1999)(citing *Port Huron Ed. Ass'n v. Port Huron Area School Dist.*, 550 N.W.2d 228, 237 (Mich. 1996)). If a contract is unambiguous, its meaning is a question of law for the court. If the language is ambiguous, however, its interpretation is a question of fact. *See UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998)(quoting *Port Huron Ed. Ass'n v. Port Huron Area School Dist.*, 550 N.W.2d 228, 237 (Mich. 1996)). A contract is ambiguous only if "its words may reasonably be understood in different ways." *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982); *see also Rossow v. Brentwood Farms Dev. Inc.*, 651 N.W.2d 458, 462 (Mich. Ct. App. 2002).

Here the relevant language in the Antenuptial Agreement is unambiguous, and its unambiguous meaning must be enforced. As the Michigan Court of Appeals has stated, in at least three cases,

"Antenuptial agreements are subject to the rules of construction

applicable to contracts in general. Antenuptial agreements, like other written contracts, are matters of agreement by the parties, and the function of the court is to determine what the agreement is and enforce it. Clear and unambiguous language may be [sic] not rewritten under the guise of interpretation; rather, contract terms must be strictly enforced as written, and unambiguous terms must be construed according to their plain and ordinary meaning. If the agreement fairly admits of but one interpretation, even if inartfully worded or clumsily arranged, it is not unambiguous [sic]. [Citations omitted.]"

*Lentz v. Lentz*, 721 N.W.2d 861, 865-66 n.3 (Mich. Ct. App. Ct. 2006) (quoting *Reed v. Reed*,

693 N.W.2d 825, 835 (Mich. Ct. App. 2005) (quoting *Kuziemko v. Kuziemko*, No. 212377, 2001

WL 1545706 (Mich. Ct. App. December 4, 2001) at *3 (citations omitted)).

It is undisputed that during Scott's lifetime, Shelley never performed her contractual

obligation to "apply and pay for" term life insurance "of at least $500,000.00" — or life

insurance in any amount — and name Scott's Revocable Trust as beneficiary. Based on this

undisputed fact, Scott's life insurance obligation to Shelley was never triggered.

The fact that Shelley finally obtained the required life insurance after Scott's death, as

vaguely alleged by Shelley,[33] does not change this conclusion. After Scott died, he obviously

could no longer change the beneficiary or beneficiaries of his life insurance to include Shelley.

Nor could the personal representative of Scott's probate estate do so. Rather, upon Scott's death,

the then-existing beneficiary of his life insurance policies obtained a vested contractual right

under the life insurance policies to payment of the life insurance proceeds. Shelley admits this,

in effect, when she argues, in her brief quoted above, that "[o]nly upon either party's death

---

[33] *See* Aff. of Shelley (Ex. 1 to Docket # 22) at ¶ 8; [Second] Aff. of Shelley (Ex. 1 to Docket # 37) at ¶¶ 2-3, 13, 16.

25

(without the requisite life insurance) was it impossible for the breaching party to cure."[34]  By this, Shelley necessarily implies the obvious fact that after Scott died, it was  then impossible for Scott to designate a beneficiary on any life insurance policy.

By the time Shelley claims that she applied and paid for the required life insurance under the Antenuptial Agreement, Scott's death had made Scott's performance of his life insurance obligation under the Agreement impossible.  Under Michigan law, such impossibility is a valid defense to Shelley's claim.  *See, e.g.*, *Roberts v. Farmers Ins. Exch.*, 737 N.W.2d 332, 342 (Mich. Ct. App. 2007) (citing *Bissell v. L.W. Edison Co.*, 156 N.W.2d 623, 626 (Mich. Ct. App. 1967)) ("A promisor's liability may be extinguished in the event his or her contractual promise becomes objectively impossible to perform.").

Because Scott's life insurance obligation to Shelley was never triggered under the Antenuptial Agreement during Scott's lifetime, neither Scott nor his probate estate could be held liable for any breach of the Agreement.  Shelley's claim based on the Antenuptial Agreement thus fails on the merits and against Shelley, therefore the Court will grant partial summary judgment for Plaintiff.[35]

---

[34] Def's. Resp. to Pl.'s Motion [etc.] (Docket # 37) at 22.

[35]  The Court has jurisdiction and authority to enter a final judgment on the merits of Shelley's claim under the Antenuptial Agreement, for the following reasons: **first**, because of the parties' consent to this Court entering a final judgment, *see* Part III of this Opinion; and **second**, because that claim is an inextricable part of the parties' dispute over the dischargeability of the claim (Count II of Plaintiff's First amended complaint), which is a core proceeding, *see, e.g., Longo v. McLaren* (*In re McLaren*), 3 F.3d 958, 965-66 (6th Cir. 1993) (quoting *Snyder v. Devitt* (*In re Devitt*), 126 B.R. 212, 215 (Bankr. D. Md. 1991) ("If it is . . . beyond question that a complaint to determine dischargeability of a debt is exclusively within the equitable jurisdiction of the bankruptcy court, then it must follow that the bankruptcy court may also render a money judgment in an amount certain without the assistance of a jury.  This is true not merely because equitable jurisdiction attaches to the entire cause of action but more importantly because it is impossible to separate the determination of dischargeability function from the function of fixing the amount of the nondischargeable debt.").

**C. Even though the Court has found it to be without merit, Shelley's claim under the life insurance provisions of the Antenuptial Agreement was and is a "claim" and a "debt," as those terms are defined and used in the Bankruptcy Code.**

For the reasons stated above, the Court has concluded that now and at all times after Scott's death, Shelley has had no *valid* claim, and no *enforceable* debt has existed in favor of Shelley, under the Antenuptial Agreement's life insurance provisions. This leads to the question whether Shelley's claim was a "debt," as that term is defined and used in the Bankruptcy Code, at the time Shelley allegedly violated the discharge injunction by filing her action in the Oakland County probate court. The meaning of the term "debt" is important to deciding Plaintiff's assertion that Shelley violated the discharge injunction under Bankruptcy Code § 524(a)(2).

Section 524(a)(2) states in pertinent part that "[a] discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset **any such debt** as a personal liability of the debtor, . . . ." 11 U.S.C. § 524(a)(2) (emphasis added). The reference in this section to "any such debt" is to "any **debt** discharged under section 727, 944, 1141, 1228, or 1328" of the Bankruptcy Code. 11 U.S.C. § 524(a)(1) (emphasis added). Scott's discharge was under Section 727, and as such, it discharged Scott:

> from all **debts** that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based

---

And there is a **third** reason why the Court has jurisdiction and authority to enter a final judgment on the merits of Shelley's claim under the Antenuptial Agreement: the Court's decision rejecting Shelley's claim under the Antenuptial Agreement is a significant and necessary part of the reasons why the Court rejects Plaintiff's claims seeking relief for Shelley's alleged violation of the discharge injunction (Counts IV and V of Plaintiff's First amended complaint) — which are core proceedings. *See* discussion in Part V.E of this Opinion.

on any such debt or liability is filed under section 501 of this title,
and whether or not a claim based on any such debt or liability is
allowed under section 502 of this title.

11 U.S.C. § 727(b) (emphasis added).

Putting these provisions together, then, the question is whether Shelley's action in filing
her complaint in the state probate court was the commencement of an action or an act to collect
or recover, as a personal liability of Scott, a "debt" that was discharged by Scott's Chapter 7
discharge. If Shelley's claim was not a "debt" by the time she filed her state court complaint
(after Scott's death), then arguably, at least, Shelley did not violate the discharge injunction, for
that reason alone.

The Bankruptcy Code defines the term "debt" to mean "liability on a claim." 11 U.S.C.
§ 101(12). "Claim," in turn, is defined very broadly, to mean:

(A) right to payment, whether or not such right is reduced to
judgment, liquidated, unliquidated, fixed, contingent, matured,
unmatured, disputed, undisputed, legal, equitable, secured, or
unsecured; or

(B) right to an equitable remedy for breach of performance if such
breach gives rise to a right to payment, whether or not such right to
an equitable remedy is reduced to judgment, fixed, contingent,
matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

The United States Supreme Court has held that the meaning of the terms "debt" and
"claim" are "coextensive." *See Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S.
552, 558 (1990). In *Cohen v. De La Cruz*, 523 U.S. 213, 217-18 (1998), the Supreme Court held
that a "claim," and by extension, a "debt," means "an enforceable obligation." The Court held
this in the course of holding that a creditor's award of treble damages against a debtor for fraud

was a "debt" within the meaning of Bankruptcy Code § 523(a)(2)(A)'s exception to discharge:

> First, an obligation to pay treble damages satisfies the threshold condition that it constitute a "debt." A "debt" is defined in the Code as "liability on a claim," § 101(12), a "claim" is defined in turn as a "right to payment," § 101(5)(A), and a "right to payment," we have said, "is nothing more nor less than an enforceable obligation." *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 559, 110 S.Ct. 2126, 2131, 109 L.Ed.2d 588 (1990). Those definitions "reflec[t] Congress' broad . . . view of the class of obligations that qualify as a 'claim' giving rise to a 'debt,'" *id.,* at 558, 110 S.Ct., at 2130-2131, and they plainly encompass treble damages. An award of treble damages is an "enforceable obligation" of the debtor, and the creditor has a corresponding "right to payment."

523 U.S. at 218.

This would seem to indicate that Shelley's claim under the life insurance provisions of the Antenuptial Agreement was no longer a "debt" after Scott died, because (as this Court has held in the preceding section of this Opinion) Scott no longer had an "enforceable obligation" to Shelley. But this would also mean that Shelley's claim may still have been a "debt" until Scott died, including at the times when Scott filed his Chapter 7 bankruptcy petition and then obtained his bankruptcy discharge. As such, that "debt" was discharged when Scott obtained his bankruptcy discharge, *unless* it was a nondischargeable debt under Bankruptcy Code §§ 523(a)(5) or 523(a)(15). If the "debt" *was* discharged, but Shelley took no action to collect or enforce the debt until a time after which it was no longer a "debt," did Shelley's action violate the discharge injunction?

In this case, the Court does not need to answer this last question. This is so, in part, because in 2017, the Supreme Court held, contrary to what it held in the 1998 *Cohen* decision, that a debt need not be an "enforceable" obligation in order to qualify as a "debt" under the

Bankruptcy Code definition. In *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407 (2017), the Supreme Court held that a creditor does not violate the Fair Debt Collection Practices Act by filing a proof of claim in a bankruptcy case, knowing that the claim is barred by a state statute of limitations. In that case, the Court did not mention the *Cohen* case, but did discuss the *Pennsylvania Dep't of Public Welfare v. Davenport* case, relied on by *Cohen*. The Court held that a claim that is "unenforceable" is still a "claim" within the meaning of the Bankruptcy definition of "claim." In this respect, at least, the *Midland Funding* case undercuts the earlier decisions in *Cohen* and *Davenport*:

> Johnson argues that the Code's word "claim" means "enforceable claim." She notes that this Court once referred to a bankruptcy "claim" as "an enforceable obligation." *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 559, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). And, she concludes, Midland's "proof of claim" was false (or deceptive or misleading) because its "claim" was not enforceable.
>
> But we do not find this argument convincing. The word "enforceable" does not appear in the Code's definition of "claim." See 11 U.S.C. § 101(5). The Court in *Davenport* likely used the word "enforceable" descriptively, for that case involved an enforceable debt. 495 U.S., at 559, 110 S.Ct. 2126. And it is difficult to square Johnson's interpretation with our later statement that "Congress intended . . . to adopt the broadest available definition of 'claim.'" *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).
>
> It is still more difficult to square Johnson's interpretation with other provisions of the Bankruptcy Code. Section 502(b)(1) of the Code, for example, says that, if a "claim" is "unenforceable," it will be disallowed. It does not say that an "unenforceable" claim is not a "claim." Similarly, § 101(5)(A) says that a "claim" is a "right to payment," "whether or not such right is . . . fixed, *contingent*, . . . . [or] *disputed*." If a contingency does not arise, or **if a claimant loses a dispute, then the claim is unenforceable. Yet this section makes clear that the unenforceable claim is nonetheless a**

30

> **"right to payment," hence a "claim," as the Code uses those terms.**

137 S.Ct. at 1412 (emphasis added) (citation omitted) (italics in original). Thus, under *Midland Funding*, an "unenforceable" claim, including even a claim which the creditor has litigated and lost, is still a "claim" and therefore a "debt," as those terms are used in the Bankruptcy Code.

Thus, Shelley's claim under the life insurance provision of the Antenuptial Agreement was a "debt" even after Scott's death, so that Shelley's action in filing suit on that claim in the state probate court *was* an action to collect and recover on a "debt" within the meaning of the § 524(a)(2) discharge injunction. This is so even though the Court now has concluded that at the time of Shelley's action she was owed no enforceable obligation under the Antenuptial Agreement.

**D.  The Court cannot determine, at this summary judgment stage, whether the debt claimed by Shelley is a "domestic support obligation" that was not discharged, under 11 U.S.C. § 523(a)(5). As a result, the Court cannot determine, at this summary judgment stage, whether Shelley violated the discharge injunction by filing her action in the state probate court.**

The parties agree that the debt claimed by Shelley arose before the date of Scott's 2012 bankruptcy petition, so that it would be subject to discharge, unless the debt is nondischargeable. This is so even if the debt was still "contingent" or "unmatured" at the time of Scott's bankruptcy petition. *See* 11 U.S.C. § 101(5), quoted in Part V.C of this Opinion; *see generally In re City of Detroit, Michigan*, 548 B.R. 748, 761-63 (Bankr. E.D. Mich. 2016) (discussing in detail how to determine whether a claim is deemed to have arisen before the filing of the bankruptcy petition). The next issue before the Court is whether the debt at issue is a "domestic support obligation" (sometimes referred to below as a "DSO"), and therefore nondischargeable under 11 U.S.C.

31

§ 523(a)(5). The Court concludes that it cannot grant summary judgment for either party on this issue.

The following is the Bankruptcy Code's definition of "domestic support obligation":

> The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is—
>
> (A) owed to or recoverable by—
>
>> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>>
>> (ii) a governmental unit;
>
> (B) **in the nature of alimony, maintenance, or support** (including assistance provided by a governmental unit) **of such spouse, former spouse,** or child of the debtor or such child's parent, **without regard to whether such debt is expressly so designated;**
>
> (C) **established** or subject to establishment before, on, or after the date of the order for relief in a case under this title, **by reason of applicable provisions of—**
>
>> (i) **a separation agreement**, divorce decree, **or property settlement agreement**;
>>
>> (ii) an order of a court of record; or
>>
>> (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
>
> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily, by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A) (emphasis added).

32

The dispute between the parties relating to this definition is two-fold.

First, Shelley contends that the debt here meets the requirements of subsection (C) of the definition, because the debt was "established . . . by reason of applicable provisions of . . . a separation agreement . . . or property settlement agreement." Plaintiff disputes that. He contends that the Antenuptial Agreement was neither a "separation agreement" nor a "property settlement agreement."

Second, Shelley contends that the debt meets the requirement of subsection (B) of the definition, in that it is "in the nature of alimony, maintenance, or support" of Shelley, a "spouse" or "former spouse" of Scott. Plaintiff denies that the debt is "in the nature of alimony, maintenance, or support."

Based on the undisputed facts, the Court finds in Shelley's favor on the first of these issues, but must deny summary judgment for either party on the second issue. The Court therefore cannot determine, at this summary judgment stage, whether the debt claimed by Shelley is a "domestic support obligation" that was not discharged in Scott's bankruptcy case, under 11 U.S.C. § 523(a)(5).

**1. The debt was "established . . . by reason of applicable provisions of" a "property settlement agreement."**

In her briefs, Shelley argued that the Antenuptial Agreement "constitutes a 'separation agreement' or a 'property settlement agreement'" within the meaning of the DSO definition.[36] And in her briefs, Shelley cited some cases that, she says, held or suggested that a particular

---

[36] Def.'s Br. in Supp. of Def.'s Mot. (Docket # 22) at 12; Def's Resp. to Pl.'s Mot. (Docket # 37) at 13.

prenuptial agreement was a "separation agreement."[37]

Shelley's apparent argument that the Antenuptial Agreement is a "separation agreement" prompted the Court to ask, during the hearing on these motions, whether the debt at issue is nondischargeable under 11 U.S.C. § 523(a)(15). That section covers a debt established by, among other things, a "separation agreement" that does not otherwise qualify as a DSO (because, for example, it is not "in the nature of alimony, maintenance, or support"). But unlike § 523(a)(5), § 523(a)(15) does not cover a debt established by a "property settlement agreement."

Section 523(a)(15) excepts from discharge any debt:

> **to a spouse, former spouse,** or child **of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor** in the course of a divorce or separation or **in connection with a separation agreement**, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit[.]

11 U.S.C. § 523(a)(15) (emphasis added).[38]

In response to the Court's questioning during the hearing, Shelley's counsel explicitly argued, for the first time in this case, that the Antenuptial Agreement is a "separation agreement" to which § 523(a)(15) would apply to make the debt nondischargeable, if the Court finds that § 523(a)(5) does not apply. But Shelley had not pleaded or argued § 523(a)(15) before the Motion hearing, and Plaintiff objected to the argument for that reason. Plaintiff also argued that

---

[37] Br. in Supp. of Def.'s Mot. (Docket # 22) at 12-15 (citing the *Kearney*, *Romano*, *Yelverton*, and *Saulsberry* cases, which are discussed in this Opinion, below); Def.'s Resp. to Pl.'s Mot. (Docket # 37) at 13-15 (same).

[38] As the opening words of § 523(a) make clear, the § 523(a)(15) exception to discharge does not apply to a discharge under 11 U.S.C. § 1328(a), in a Chapter 13 case, but it does apply to a discharge in a Chapter 7 case, such as this one. The § 523(a)(5) exception to discharge applies to all discharges in both Chapters 7 and 13.

34

§ 523(a)(15) does not apply in any event. After the hearing, Shelley filed a motion seeking leave to amend her answer in this adversary proceeding, to allege, in the alternative, the § 523(a)(15) exception to discharge, in addition to continuing to allege the § 523(a)(5) exception. Plaintiff has objected to that motion, on several grounds.[39]

For the following reasons, the Court concludes that the Antenuptial Agreement, including its life insurance provisions, (1) *is* a "property settlement agreement" within the meaning of the DSO definition; and (2) *is not* a "separation agreement," as that term is used in the DSO definition and in § 523(a)(15). Because the Antenuptial Agreement is not a "separation agreement," the exception to discharge under 11 U.S.C. § 523(a)(15) does not apply.

### a. The Antenuptial Agreement is a "property settlement agreement."

The Bankruptcy Code does not define the term "property settlement agreement" or the term "separation agreement." But the Antenuptial Agreement clearly falls within the plain meaning of "property settlement agreement." The Agreement defined the respective property rights of Scott and Shelley, during their marriage, in the event of a divorce, and in the event of the death of one of them. The Agreement specifically defined the "Separate Property" of each of the parties, and stated that Scott and Shelley each retain their "Separate Property" during the marriage and in the event of divorce or death. The Agreement defined the parties' "Marital Property" — *i.e.*, property that Scott and Shelley acquired during their marriage that was not proceeds or income from their "Separate Property" — and provided that each would receive one-

---

[39] Shelley filed that motion for leave to amend on June 18, 2018 (Docket # 63). Plaintiff filed his objection to that motion on June 29, 2018 (Docket # 71). The Court has not yet taken any action on that motion, but now will enter an order denying the motion, based on the futility of amendment. The proposed amendment of Shelley's answer would be futile because the Court is now ruling that the Antenuptial Agreement is not a "separation agreement." For that reason, § 523(a)(15) does not apply.

35

half the Marital Property in the event of a divorce. (Necessarily, of course, the Agreement could not define in advance the specifics of such a half-and-half split of the Marital Property, because the precise property that would be acquired during the marriage was not yet known.) And the Antenuptial Agreement provided that Scott and Shelley would have no rights against each other in the event of divorce or death, except as stated in the Agreement.

These provisions are clearly a settlement of property interests of the parties. So the Antenuptial Agreement is clearly a "property settlement agreement" as that term is used in the DSO definition. *See, e.g., Sparks v. Sparks* (*In re Sparks*), 206 B.R. 481, 485 (Bankr. N.D. Ill. 1997) (holding that a prenuptial agreement was a "property settlement agreement" under § 523(a)(5)).

Part of this settlement of the parties' property interests, and part of the consideration each party received, were the Antenuptial Agreement's life insurance provisions. As described in Part II.B of this Opinion, Scott came into the marriage already having two term life insurance policies, with a total benefit amount of $1.4 million. Before the marriage, the sole beneficiary under these life insurance policies was Scott's Trust, and the sole beneficiary under that Trust was Scott's minor daughter. So Scott came into his marriage to Shelley having a property interest in two term life insurance policies with a large potential value, albeit a value contingent on Scott's death occurring while these term life insurance policies were still in effect. In the Antenuptial Agreement, the parties agreed to what Shelley's interest would be (and be limited to) in Scott's $1.4 million in life insurance policies. They agreed that Shelley would be named the beneficiary under these policies for somewhere between $500,000.00 and $1.4 million in coverage, depending on Shelley first obtaining term life insurance for Scott's benefit of at least

36

$500,000.00, the exact amount of which depended on the amount of term life insurance coverage that Shelley obtained on her own life. And they agreed that Shelley would obtain and pay for term life insurance of at least $500,000.00, with Scott's Trust named as the beneficiary.

Thus, the life insurance provisions of the Antenuptial Agreement, upon which Shelley's claim is based, were part of the "property settlement agreement" between Scott and Shelley. In terms of defining the consideration that Scott and Shelley gave to each other in the Antenuptial Agreement, it is impossible to separate the life insurance provisions from the other property settlement provisions.

For these reasons, the Court concludes that Shelley's claim is a debt "established . . . by reason of applicable provisions of" a "property settlement agreement," within the meaning of the DSO definition, 11 U.S.C. § 101(14A). As such, the debt is a DSO *if* it "is in the nature of . . . support."

**b. The Antenuptial Agreement is not a "separation agreement."**

While the Antenuptial Agreement is a "property settlement agreement," the Court concludes that it is not a "separation agreement," as that term is used in the DSO definition and in § 523(a)(15). The Antenuptial Agreement says nothing at all about separation, or about what would happen in the event Scott and Shelley were to enter into a separation during the marriage. The Agreement does not purport to define or limit what rights the parties would have during a separation — *i.e.*, during a time when they were separated but not yet divorced, or during a time when they were separated and just remained separated and never got divorced. It is true that the Agreement gave Scott and Shelley each the full, continuing rights to their respective "Separate Property" during the marriage, and those rights presumably would have continued during a legal

37

separation. But the Agreement did not govern what other rights the parties would have during a legal separation. Rather, the Agreement only addressed what happened in the event of a divorce or death of one of the parties. As a result, the Court cannot find that the Antenuptial Agreement is a "separation agreement."

Shelley's counsel argued during the hearing that the Antenuptial Agreement is a "separation agreement" simply because it defined rights of the parties in the event of death or divorce. This is so, Shelley's counsel argued, because death and divorce each is a form of separation. But the Court must reject this argument. Under common usage, and under Michigan family law, a separation is different from a divorce, and it is different from widowhood. Moreover, a separation agreement is an agreement entered into *after* marriage, unlike a prenuptial agreement. *See Sparks*, 206 B.R. at 485 (holding that because a prenuptial agreement "was entered into by the parties in contemplation of marriage, it is clearly not a 'separation agreement'" within the meaning of § 523(a)(5)).

Michigan law recognizes an action "brought . . . for a separation," in addition to an action "brought . . . for a divorce." *See* Mich. Comp. Laws Ann. § 552.13(1). The separation action is also known as an "action for separate maintenance." *See, e.g.*, Mich. Comp. Laws Ann. § 552.7. Where the action is for a "separation," rather than for a divorce, the court may award a "judgment of . . . separate maintenance," as opposed to a "judgment of divorce." *See* Mich. Comp. Laws Ann. § 552.23(1).[40] In *Lentz v. Lentz*, 721 N.W.2d 861 (Mich. Ct. App. 2006), the Michigan

---

[40] In either type of action — divorce or separation — the court may, among other things, "require either party to pay alimony for the suitable maintenance of the adverse party." Mich. Comp. Laws Ann. § 552.13(1). Upon entry of a divorce judgment or a "judgment of separate maintenance," among other things, "the court may make a further judgment for restoring to either party the whole, or such parts as it shall deem just and reasonable, of the real and personal estate that shall have come to

38

Court of Appeals distinguished "antenuptial agreements" from "separation agreements," and characterized the latter as being "postnuptial" — *i.e.*, entered into after marriage, not before marriage. *See* 721 N.W.2d at 866-67. The *Lentz* court also characterized the separation agreement as "a property agreement negotiated by the parties when divorce or separate maintenance is clearly imminent," *id.* at 869, and as a "property agreement[] entered into at the time of separation." *Id.* at 866.

For these reasons, the Court concludes that the Antenuptial Agreement is not a "separation agreement" within the meaning of Bankruptcy Code § 523(a)(15).

The cases cited by Shelley do not persuade the Court to hold otherwise. First, one of the cases cited by Shelley actually held that a prenuptial agreement is *not* a "separation agreement." *See Sparks*, 206 B.R. at 485 (because a prenuptial agreement "was entered into by the parties in contemplation of marriage, it is clearly not a 'separation agreement'" within the meaning of § 523(a)(5)).

Second, two other cases cited by Shelley did *not* hold that a prenuptial agreement was a "separation agreement" under § 523(a)(15). *See Floody v. Kearney* (*In re Kearney*), 433 B.R. 640, 643, 647, 651 (Bankr. S.D. Tex. 2010) (prenuptial agreement terms were incorporated into a judgment of divorce, and the parties later entered into a settlement agreement resolving a

---

either party by reason of the marriage, or for the awarding to either party the value thereof, to be paid by either party in money." Mich. Comp. Laws Ann. § 552.19. And upon entry of either type of judgment, "if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party, the court may also award to either party the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all other circumstances of the case." Mich. Comp. Laws Ann. § 552.23(1).

contempt claim by one ex-spouse, who alleged that the other ex-spouse had violated the divorce judgment; the bankruptcy court held that debt arising out of the settlement agreement was nondischargeable under § 523(a)(15), because it arose out of the parties' divorce and divorce judgment); *Romano v. Romano* (*In re Romano*), 548 B.R. 39, 41-42, 46-49 (Bankr. S.D.N.Y. 2016) (case did not involve a prenuptial agreement; rather, the Chapter 13 debtor's obligations arose under a post-nuptial separation agreement, under which the parties separated but remained married; bankruptcy court held that obligations were domestic support obligations under § 523(a)(5); court implicitly held that the agreement was either a "separation agreement" or a "property settlement agreement," or both, but did not specify which of these types of agreement it was, since both types are covered by § 523(a)(5)).

Third, while two of the cases cited by Shelley arguably support the proposition that a prenuptial agreement is or can, at least in part, be deemed to be, a "separation agreement," the Court finds those cases unpersuasive.  In *Yelverton v. De Nagy-Unyom (In re Yelverton)*, No. 12-10011, 2012 WL 4434087 (Bankr. D.D.C. Sept. 24, 2012), at *1, 2, 8-10, 13 n.9, the bankruptcy court held, among other things, that either § 523(a)(5) or § 523(a)(15) covered a Chapter 7 debtor's obligation under a prenuptial agreement to pay his spouse $7,000 per month marital support payments during the marriage.  The court reasoned that this was an obligation arising from a "separation agreement" with respect to the months *after* the parties legally separated and proceeded to a divorce, but *not* with respect to the months *before* the parties separated.  The court reached the latter conclusion because under the prenuptial agreement the marital support payments "were owed even without the parties separating." *Id*. at *9.  But the court held that § 523(a)(5) nonetheless applied to those pre-separation payment obligations under the prenuptial

40

agreement, because they were "established" "'by reason of applicable provisions of . . . an order

of a court of record.'" *Id*. at *8 (quoting 11 U.S.C. § 101(14A)(C).)  This was so, the court

reasoned, because the state court had ruled during the parties' divorce case that the prenuptial

agreement obligations were valid and enforceable.  The *Yelverton* court also stated that to the

extent the prenuptial agreement included terms "that were to govern in the event of a divorce,"

the agreement "constitutes a separation agreement for purposes of [the DSO definition]").  *Id*. at

*8 n.9.

In *Davis v. Saulsbury* (*In re Saulsbury*), No. 01-3013, 2012 WL 5450993 (Bankr.

N.D.N.Y. Nov. 7, 2012) at *2, the bankruptcy court held that an obligation under a prenuptial

agreement that was incorporated into the parties' divorce decree was nondischargeable under

§ 523(a)(15), because it was "incurred by the Debtor in the course of his divorce and as part of

the divorce decree." *Id*.  Alternatively, the court held, the prenuptial agreement constituted a

"separation agreement" under § 523(a)(15).  As to this latter point, the *Saulsbury* court discussed

New York law, and reasoned:

> [T]he term "separation agreement" as an instrument for dividing
> marital property has broad application and is not confined to its
> traditional meaning or label.  Prior to the recent advent of
> "no-fault" divorce in New York State, a separation agreement
> acted not only to distribute marital property, but additionally
> provided parties with a ground for divorce after the expiration of a
> one-year waiting period.  Today, a "separation agreement" may be
> embodied in an agreement by another name, as, *e.g.*, an "opting-out
> agreement," which  does not provide a ground for divorce, but
> nonetheless acts to distribute marital property.  Similarly,
> "pre-nuptial agreements" often operate in the same fashion.  For
> this reason, the court finds that the Agreement may also constitute
> a "separation agreement" for purposes of § 523(a)(15).

*Id*. at *2.

41

Arguably, at least, the *Yelverton* and *Saulsbury* cases may support Shelley's argument in this case, that Scott's life insurance obligation under the Antenuptial Agreement was an obligation "in connection with a separation agreement" within the meaning of § 523(a)(15). But to that extent, the Court finds the reasoning of those cases to be unpersuasive, and respectfully declines to follow them. Rather, the Court concludes that § 523(a)(15) does not apply to Scott's life insurance obligation in this case, for the reasons stated above.

**2. The Court cannot grant summary judgment for either party on the issue whether the debt is "in the nature of alimony, maintenance, or support . . ., without regard to whether such debt is expressly so designated."**

Shelley contends that the debt at issue is "in the nature of . . . support." Plaintiff denies that. The Court concludes that it cannot grant summary judgment for either party on this issue.

Typically, the task of determining whether a debt is in the nature of support is to distinguish between support obligations on the one hand, and obligations that are "in actuality a division of marital property," on the other hand. *See Sorah v. Sorah* (*In re Sorah*), 163 F.3d 397, 400 (6th Cir.1998). But necessarily under the DSO definition, there can be such a thing as a debt "established . . . by reason of . . . a property settlement agreement" that also is "in the nature of . . . support." *See* 11 U.S.C. §§ 101(14A)(B) and 101(14A)(C)(i).

> Determining if an obligation is in the nature of support in bankruptcy is a federal question. *Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103, 1107 (6th Cir.1983) (citations omitted). "When a court determin[es] what constitutes debt "in the nature of alimony, maintenance, or support" under § 101(14A), the case law construing pre-BAPCPA § 523(a)(5), which utilized the same language, is relevant.'" *In re Palmieri*, no. 11 51224, 2011 WL 6812336, at *4 (Bankr. E.D. Mich. Nov. 21, 2011) (quoting *In re Boller*, 393 B.R. 569, 574 (Bankr. E.D. Tenn.2008)).

*In re Larson-Asplund*, 519 B.R. 682, 688 (Bankr. E.D. Mich. 2014).

In the Sixth Circuit, the case law on this issue is rather complicated. The issue generally is governed by three decisions of the United States Court of Appeals for the Sixth Circuit. These cases all were decided before the 2005 amendments to the Bankruptcy Code (commonly called "BAPCPA").[41] The three Sixth Circuit cases are *Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103 (6th Cir.1983); *Fitzgerald v. Fitzgerald* (*In re Fitzgerald*), 9 F.3d 517 (6th Cir.1993); and *Sorah v. Sorah* (*In re Sorah*), 163 F.3d 397 (6th Cir.1998).

Initially, it should be noted that none of these Sixth Circuit cases concerned a prenuptial agreement. Nor did any of these cases consider whether an obligation to provide life insurance coverage was in the nature of support and therefore nondischargeable. Because of this, trying to apply these Sixth Circuit cases to this case is rather difficult.

The first of these cases, *Calhoun*, was decided in 1983. It involved a separation agreement, later incorporated into a divorce decree, in which the bankruptcy debtor had agreed to assume five loan obligations that had been jointly incurred during the marriage, and to hold his

---

[41] Before the 2005 amendments, Bankruptcy Code § 523(a)(5) contained the exception to discharge comparable to present § 523(a)(5)'s exception for a "domestic support obligation." The pre-2005 version of § 523(a)(5), in pertinent part, excepted from discharge any debt:

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
> . . .
>
> > (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

(emphasis added).

43

wife harmless for their payment.  As the court described it, the separation agreement

"characterizes this assumption as alimony and support although it is found in the section of the

document labeled Division of Property.  Another section labeled Alimony states that there shall

be no alimony other than that provided in the debts and obligations section."  715 F.2d at 1105.

The second of the Sixth Circuit cases, *Fitzgerald*, was decided in 1993.  It involved an

agreed divorce judgment that had obligated the bankruptcy debtor to pay $1,500 per month in

"alimony" to his former spouse, which was "not to be reduced in the event [the former spouse]

became gainfully employed, but [which was] to terminate upon her death or remarriage."  9 F.3d

at 518.  Among other things, the divorce judgment also divided the marital property between the

parties, required the debtor to pay all marital debts, and required the debtor to pay his former

spouse a lump sum of $14,000 within one year.  *Id.*  Although the divorce judgment also required

the debtor to name his former spouse "the irrevocable beneficiary of a life insurance policy," *id.*,

the dischargeability of that life insurance obligation was not at issue and was not discussed in

*Fitzgerald*.  The only issue in *Fitzgerald* was whether the debtor's obligation to pay $1,500.00

per month in "alimony" payments was "actually in the nature of alimony, maintenance, or

support," and, therefore, nondischargeable under the pre-BAPCPA version of Bankruptcy Code

§ 523(a)(5)(B).  And in *Fitzgerald*, the parties both testified that they intended that the obligation

"was for support."  *Id.* at 519.

The third of the Sixth Circuit cases, *Sorah*, was decided in 1998.  In that case, the

bankruptcy debtor was obligated by a divorce judgment to make monthly payments of $750.00 to

his ex-spouse.  The divorce judgment labeled this payment obligation as "maintenance," and

provided that it would cease upon the ex-spouse's "death, remarriage or 62nd birthday,

whichever occurs first." 163 F.3d at 399. The issue was whether the debtor's monthly payment obligation was "actually in the nature of alimony, maintenance, or support," and, therefore, nondischargeable under the pre-BAPCPA version of Bankruptcy Code § 523(a)(5)(B).

The holdings of the *Calhoun*, *Fitzgerald*, and *Sorah* cases, and the development of the law that they represent, were summarized well by another judge of this district in the case of *Goans v. Goans* (*In re Goans*), 271 B.R. 528 (Bankr. E.D. Mich. 2001):

> In *Long v. Calhoun* (*In re Calhoun*),715 F.2d 1103 (6th Cir.1983), the Sixth Circuit established a four-step analysis for determining when an obligation, which is not specifically designated as alimony or maintenance, is nonetheless in the nature of support and thus nondischargeable. First, the obligation constitutes support only if the state court or parties intended to create a support obligation. Second, the obligation must have the actual effect of providing necessary support. Third, if the first two conditions are satisfied, the court must determine if the obligation is so excessive as to be unreasonable under traditional concepts of support. Fourth, if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law. *Calhoun*, 715 F.2d at 1109-10; *Singer v. Singer* (*In re Singer*), 787 F.2d 1033, 1036 (6th Cir.1986).

> In *Fitzgerald v. Fitzgerald* (*In re Fitzgerald*), 9 F.3d 517 (6th Cir.1993), the Sixth Circuit revisited the issue of nondischargeability under § 523(a)(5) and, recognizing that *Calhoun* had been applied more broadly than intended, stated that the second element of the four-part test of *Calhoun*, commonly referred to as the "present needs" test, did not apply in situations where the obligation at issue was specifically denominated as alimony and intended by the state court or the parties as such. *Id*. at 520-521. *See also Chism v. Chism* (*In re Chism*), 169 B.R. 163, 168 (Bankr.W.D.Tenn.1994); *Pinkstaff v.Pinkstaff* (*In re Pinkstaff*), 163 B.R. 504, 507 (Bankr. N.D.Ohio 1994). The court in *Prager v. Prager* (*In re Prager*), 181 B.R. 917 (Bankr.W.D.Tenn. 1995), interpreted *Fitzgerald* as follows:

> > In *Fitzgerald*, the Sixth Circuit revisited its holding in *Calhoun* and in essence admonished that

45

the *Calhoun* analysis is only to be applied in
instances where the nature of an obligation under a
divorce decree or marital dissolution agreement is
unclear; however, where an obligation is labeled as
alimony, maintenance, or support and the parties
intended to create a support obligation, the
bankruptcy court's inquiry should end.

*Prager*, 181 B.R. at 920. *See also Silverstein v. Glazer* (*In re
Silverstein*), 186 B.R.85, 87 (Bankr.W.D.Tenn.1995) (No need to
apply the four step analysis of *Calhoun* because obligation has
been clearly designated by the parties as child support.).

More recently, in *Sorah v. Sorah* (*In re Sorah*), 163 F.3d
397 (6th Cir.1998), the Sixth Circuit reiterated that when a state
court specifically labels an obligation as support, and the obligation
has all the indicia of support, the obligation should be conclusively
presumed to be a support obligation by the bankruptcy court. The
court stated:

There is a saying that if something looks like
a duck, walks like a duck, and quacks like a duck,
then it is probably a duck. In determining whether
an award is actually support, the bankruptcy court
should first consider whether it "quacks" like
support. Specifically, the court should look to the
traditional state law indicia that are consistent with
a support obligation. These include, but are not
necessarily limited to, (1) a label such as alimony,
support, or maintenance in the decree or agreement,
(2) a direct payment to the former spouse, as
opposed to the assumption of a third-party debt, and
(3) payments that are contingent upon such events
as death, remarriage, or eligibility for Social
Security benefits.

An award that is designated as support by
the state court and that has the above indicia of a
support obligation (along with any others that the
state support statute considers) should be
conclusively presumed to be a support obligation by
the bankruptcy court. A non-debtor spouse who
demonstrates that these indicia are present has

46

satisfied his or her burden of proving that the
obligation constitutes support within the meaning of
§ 523, and is thus nondischargeable.  The burden
then shifts to the debtor spouse to demonstrate that
although the obligation is of the type that may not
be discharged in bankruptcy, its amount is
unreasonable in light of the debtor spouse's
financial circumstances.

*Sorah*, 163 F.3d at 401 (citation omitted).

However, if the state court has not specifically labeled an
obligation as support, the bankruptcy court "must look behind the
award that is made under state law and make an independent
factual inquiry to determine whether the award is actually in the
nature of support."  *Harvey v. McClelland* (*In re McClelland*), 247
B.R. 423, 426 (Bankr.N.D.Ohio 2000).  *See also Luman v. Luman*
(*In re Luman*), 238B.R. 697, 705 n. 2 (Bankr.N.D.Ohio 1999)
(When the obligation is not labeled support *Calhoun* still applies.).

To ascertain whether such an award is in the nature of
support, the bankruptcy court must first determine whether the
state court intended to create a support obligation.  *Calhoun*, 715
F.2d at 1109.  *See also McClelland*, 247 B.R. at 426.  In
determining intent, the bankruptcy court may consider any relevant
factors, including: the nature of the obligation; the structure and
language of the divorce decree; whether other lump sum or
periodic payments were also provided; the length of the marriage;
the relative earning powers of the parties; the age, health and work
skills of the parties; the adequacy of support absent the obligation
in question; and evidence of negotiation or other understandings as
to the intended purpose of the obligations.  *Calhoun*, 715 F.2d at
1108 n. 7.

271 B.R. at 532-33.

In this case, in arguing about whether Scott's life insurance obligation was in the nature

of support, the parties have focused heavily on the three specific "traditional indicia" of support

identified in the *Sorah* case, namely "(1) a label such as alimony, support, or maintenance in the

decree or agreement, (2) a direct payment to the former spouse, as opposed to the assumption of

a third-party debt, and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits." *Sorah*, 163 F.3d at 401.

There are several problems with the parties' heavy focus on these three *Sorah* factors. The first problem is that the *Sorah* analysis does not apply unless the obligation at issue is labeled as "alimony, maintenance, or support" in the agreement or judgment. Where the obligation is *not* so labeled, the *Calhoun* analysis (as refined by *Fitzgerald*), rather than the *Sorah* analysis, applies. *See, e.g., Goans*, 271 B.R. at 533, quoted above.

Scott's life insurance obligation under the Antenuptial Agreement in this case is not labeled as alimony, maintenance, or support. (To be fair, however, neither is it labeled as a property division.) So the four-part *Calhoun* analysis applies, rather than the *Sorah* analysis. And the parties have not directly or fully addressed the four-part *Calhoun* analysis, described by the court in *Goans*, quoted above.

A second problem with the parties' arguments about the three *Sorah* factors listed above is that these factors are inconclusive in this case. As to the first *Sorah* factor, as noted above, there is no label of support placed on Scott's life insurance obligation in the Antenuptial Agreement. Nor is there any other relevant label placed on that obligation. But after the 2005 BAPCPA amendments, and under the current DSO definition, the inquiry whether the debt is "in the nature of alimony, maintenance, or support" is expressly "without regard to whether such debt is expressly so designated." *See* 11 U.S.C. § 101(14A)(B).

As to the second *Sorah* factor, namely, whether the obligation involves "a direct payment to the former spouse, as opposed to the assumption of a third-party debt," the obligation in this case is *neither* a direct payment by Scott to Shelley *nor* the assumption by Scott of a third-party

48

debt.

As to the third *Sorah* factor, whether the obligation involves "payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits," the obligation in this case does not involve payments by Scott to Shelley at all. Rather, it involved Scott's naming Shelley as beneficiary under term life insurance policies that Scott already had, and which Scott's father had paid for. It is true that the Antenuptial Agreement did not limit Scott's life insurance obligation, by ending the obligation upon Shelley's death, or her remarriage, or her becoming eligible for Social Security benefits. But actually, the Agreement did not require Scott to continue to keep his term life insurance in place, and for either Scott or his father to continue to pay premiums for it, for any particular length of time.

A third problem with the parties' focus on the three *Sorah* factors is that, as *Sorah* itself indicates, these three factors are not exclusive. *Sorah* states that the "traditional state law indicia that are consistent with a support obligation" "include, but are not necessarily limited to," the three factors discussed above. *Sorah*, 163 F.3d at 401. As explained by another case from this district,

> Though *Sorah* characterized the three above factors as the *traditional* indicia of support, the court did not hold they were the *exclusive* factors that could be considered. *Sorah*, 163 F.3d at 401. "[L]ower courts need not limit their analyses to consideration of the three indicia discussed above, but may also consider other factors." *McNamara v. Ficarra* (*In re McNamara*), 275 B.R. 832, 837 (E.D.Mich.2002) (citing *Sorah*, 163 F.3d at 401) (other citation omitted). Therefore, even if a creditor does not establish the conclusive presumption through the three *Sorah* factors, the Court may nevertheless resort to other factors to find that an obligation is in the nature of support. *Id.*; *see also Andrus v. Ajemian* (*In re Andrus*), 338 B.R. 746, 754-55 (Bankr. E.D. Mich.2006) (finding that not all of the three *Sorah* factors were

49

present, and looking to other indicia to determine whether the debt
was for support).

*Larson-Asplund*, 519 B.R. at 689 (italics in original).

It is of course true that one's receipt of life insurance benefits can provide helpful

financial support. But that general proposition by itself does not take us very far under the

*Calhoun* analysis — the same general statement can be made about one's receipt of *any* property,

including property received in a division of marital property under a prenuptial agreement or

divorce judgment. Yet that by itself does not make it "in the nature of . . . support." In

discussing the obligation at issue in *Calhoun*, for example, which was the debtor's assumption of

joint loan obligations, the Sixth Circuit noted that:

> The initial difficulty is that every assumption of a joint loan
> obligation in a divorce settlement at least indirectly contributes to
> support. . . .. Support in this broad sense results even if the
> assumption of joint marital debts is actually a division of property.

*Calhoun*, 715 F.2d at 1108. The same thing can be said about a debtor's obligation to provide a

spouse with life insurance coverage.

There is some evidence tending to establish the first part of the four-part *Calhoun* test —

*i.e.*, that Shelley and Scott intended for Scott's life insurance obligation to be support. This

evidence includes Shelley's testimony, which admittedly is self-serving, and which Scott is no

longer alive to respond to. As discussed in Part II.B of this Opinion, this evidence is that:

> Shelley's understanding of the intent behind the life insurance
> provisions in Paragraph IV.4 of the Antenuptial Agreement was "to
> insure that in the event of Scott's death, he would be able to
> provide maintenance and support for [Shelley] so that [she] would
> continue to live in the manner in which the two of [them] had
> grown accustomed and vice versa." In other words, "[P]aragraph
> IV.4. of the Agreement was intended to make sure that in the event

50

of either of [Scott's or Shelley's] deaths, the other would be
provided with maintenance and support through insurance
proceeds so that the survivor would be able to continue to live in
the house and not be forced to sell it for support."

(footnotes omitted).  While this is some evidence tending to favor Shelley with respect to the first

part of the four-part *Calhoun* test, it does not address the other three parts of the *Calhoun* test.

These include, for example, the second part, which the *Goans* case described as requiring that

"the obligation must have the actual effect of providing necessary support."  *Goans*, 271 B.R. at

532.  In *Calhoun* itself, the Sixth Circuit stated this as requiring that the obligation "has the *effect*

of providing the support *necessary* to ensure that the daily needs of the former spouse and any

children of the marriage are satisfied."  *Calhoun*, 715 F.2d at 1109 (italics in original).  In their

motions, the parties have not addressed this second part of the *Calhoun* test, and have offered no

evidence about it.

Under the applicable Sixth Circuit case law, and on the present record in this case, the

Court concludes that it cannot grant summary judgment to either party on the issue of whether

Scott's life insurance obligation was "in the nature of support," so as to make it a

nondischargeable domestic support obligation.  Genuine issues of material fact preclude

summary judgment for either party on this issue.

**E.  Even if Shelley violated the discharge injunction, the Court has discretion as to whether
to award any monetary or other relief for such violation, and in this case the Court
declines to award any such relief.**

In his first amended complaint, Plaintiff seeks two forms of relief for Shelley's alleged

violation of the discharge injunction: (1) an order from this Court requiring Shelley to dismiss

her state probate court action (Count IV); and (2) sanctions for contempt in the form of attorney

fees and costs incurred by Plaintiff because of the violation of the discharge injunction (Count V).[42]

Because the Court cannot determine, at this summary judgment stage, whether the debt at issue was discharged by Scott's bankruptcy discharge, the Court also cannot determine, at this summary judgment stage, whether Shelley's action in filing the state probate court action violated the discharge injunction. As a result, the Court cannot determine, at this stage, whether Plaintiff might be entitled to any relief against Shelley for a violation of the discharge injunction.

But the Court is now able to determine, and now rules, that even if Shelley did violate the discharge injunction as alleged by Plaintiff, the Court will, in its discretion, decline to grant Plaintiff any monetary or injunctive relief for such violation.

Bankruptcy courts have authority, under their civil contempt powers, to order appropriate monetary and injunctive relief for a violation of the § 524(a)(2) discharge injunction. But as discussed below, bankruptcy courts have discretion in deciding whether to order such relief.

This Court discussed the law applicable to a violation of the discharge injunction in the case of *Holley v. Kresch Oliver, PLLC* (*In re Holley*), 473 B.R. 212 (Bankr. E.D. Mich. 2012):

> Plaintiff seeks relief for Defendants' violations of the discharge injunction contained in Bankruptcy Code § 524(a)(2). That section states:
>
> > (a) A discharge in a case under this title—
> > . . .
> >
> > (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [debt discharged under section 727] as

---

[42] First Am. Compl. (Docket # 19) at 10-12.

52

a personal liability of the debtor, whether or not
discharge of such debt is waived[.]

11 U.S.C. § 524(a)(2). The Sixth Circuit has held that no private
right of action exists under 11 U.S.C. § 524 for a violation of the
discharge injunction. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d
417, 422–23 (6th Cir.2000). Rather, bankruptcy courts enforce
§ 524 through civil contempt proceedings. *See id.* at 422; *see also
Gunter v. Kevin O'Brien & Assocs. Co. LPA (In re Gunter)*, 389
B.R. 67, 71 (Bankr. S.D. Ohio 2008)(citing *Pertuso*, 233 F.3d at
421)("[A] debtor's only recourse for violation of the discharge
injunction is to request that the offending party be held in contempt
of court.").

Bankruptcy courts have civil contempt powers. Those
powers "flow from Bankruptcy Code § 105(a) and the inherent
power of a court to enforce compliance with its lawful orders." *In
re Walker*, 257 B.R. 493, 496 (Bankr. N.D. Ohio 2001) (citations
omitted). The United States Court of Appeals for the Sixth Circuit
has held that:

> In a civil contempt proceeding, the petitioner must
> prove by clear and convincing evidence that the
> respondent violated the court's prior order.
>
>> A litigant may be held in contempt if
>> his adversary shows by clear and
>> convincing evidence that "he
>> violate(d) a definite and specific
>> order of the court requiring him to
>> perform or refrain from performing a
>> particular act or acts with knowledge
>> of the court's order."
>
> It is the petitioner's burden . . . to make a prima
> facie showing of a violation, and it is then the
> responding party's burden to prove an inability to
> comply. . . .
>
>> [T]he test is not whether
>> [respondents] made a good faith
>> effort at compliance but whether "the
>> defendants took all reasonable steps

53

within their power to comply with
the court's order."

[G]ood faith is not a defense to civil
contempt. Conversely, impossibility
would be a defense to contempt, but
the [respondent] had the burden of
proving impossibility, and that
burden is difficult to meet.

*Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998)(citations
omitted); *see also Liberte Capital Grp., LLC v. Capwill*, 462 F.3d
543, 550 (6th Cir.2006); *Elec. Workers Pension Trust Fund of
Local Union # 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373,
379 (6th Cir. 2003).

In the context of a violation of the discharge
injunction, this means that the act must have been
willful.  The question of whether the violation is
willful is based on whether the creditor intended the
acts that constituted the violation. The standard does
not require proof that the creditor deliberately
violated the injunction.  Thus, a debtor who alleges
a violation of § 524(a)(2) must establish by clear
and convincing evidence (1) the creditor violated
the discharge injunction and (2) the creditor did so
with actual knowledge of the injunction.

*In re Frambes*, No. 08-22398, 2012 WL 400735, at *5 (Bankr.
E.D. Ky. Feb. 7, 2012)(citations omitted).

If a bankruptcy court finds a creditor in civil contempt for
violating the discharge injunction, the court may award the debtor
*compensatory* damages, including attorney fees and costs.  *In re
Johnson*, 439 B.R. 416, 428 (Bankr. E.D. Mich. 2010), *aff'd on
other grounds*, No. 10-14292, 2011 WL 1983339 (E.D. Mich. May
23, 2011); *Gunter*, 389 B.R. at 71-72; *In re Perviz*, 302 B.R. 357,
370 (Bankr. N.D. Ohio 2003).

473 B.R. at 214-15 (italics in original).

This Court has discretion in deciding whether to award relief, including monetary relief,

54

for a violation of the discharge injunction. *See, e.g.*, *Badovick v. Greenspan* (*In re Greenspan*), 464 B.R. 61, No. 10-8019, 2011 WL 310703, at *5 (B.A.P. 6th Cir. 2011) (internal quotation marks and citation omitted) (the court has "broad discretion . . . in selecting an appropriate sanction" for a violation of the discharge injunction); *In re Perviz*, 302 B.R. 357, 370, 370 n. 4 (Bankr. N.D. Ohio 2003) (sanctions and monetary relief for violations of the discharge injunction are discretionary); *Mitchell v. Anderson* (*In re Mitchell*), 545 B.R. 209, 227-28 (Bankr. N.D. Ohio 2016) (damages for violation of the discharge injunction are "within the Court's discretion;" and holding that even if the defendant violated the discharge injunction, the court would not award any damages to the debtor under the circumstances of that case).

In its discretion, and given what the Court has now decided at this summary judgment stage of this adversary proceeding, the Court will decline to order any injunctive or monetary relief against Shelley, even if it is established that she violated the discharge injunction as alleged by Plantiff. As a practical matter, the injunctive relief sought by Plaintiff — an order requiring Shelley to dismiss her state probate court action — is unnecessary, because Shelley now has lost on the merits of the claim she asserted in that state court action. Shelley has no viable recourse left in state court. Her only possible recourse now, to continue to pursue her claim, is to appeal this Court's summary judgment decision.

Nor does it make sense for the Court to hold out the possibility that it might grant monetary relief to Plaintiff, if he ultimately prevails on his claim that Shelley violated the discharge injunction. The Court's summary judgment ruling means that a trial will be necessary in order for the Court to determine whether Shelley's filing of the state court probate action was a violation of the discharge injunction. The outcome on that issue is far from certain at this point.

55

Both parties will incur significant time and expense going forward, in preparing for and conducting such a trial. Such time and expense will be avoided by the Court's discretionary decision, now, that it will not grant Plaintiff any relief for Shelley's alleged discharge injunction violation.

Another important consideration is that the only monetary relief that this Court would likely consider awarding, *if* Plaintiff established a discharge injunction violation, and if the Court were to award any monetary relief at all for such violation, would be limited to the reasonable fees and costs incurred by Plaintiff in moving the parties' dispute from the state court to this court. This would be limited to the reasonable attorney fees incurred by Plaintiff in seeking and obtaining the reopening of Scott's bankruptcy case and then filing this adversary proceeding. Such monetary relief likely would not include any attorney fees or expenses incurred by Plaintiff in litigating this adversary proceeding after filing it.

In the grand scheme of things, such limited attorney fees and expenses likely would be relatively small. The lion's share of the Plaintiff's attorney fees and expenses no doubt has been in litigating, in this adversary proceeding, the issue of dischargeability and the related issue of whether Shelley has a valid claim. And those same fees and expenses would have been incurred by Plaintiff if Shelley had filed a nondischargeability adversary proceeding in this Court, rather than filing an action in the state probate court. If Shelley had done that, this Court would not have awarded *any* monetary relief to Plaintiff, even if Plaintiff prevailed. This is because the bankruptcy rules expressly allow a creditor like Shelley to file a nondishargeability action based on Bankruptcy Code §§ 523(a)(5) and 523(a)(15), at any time after discharge. Under Fed. R. Bankr. P. 4007(a), "[a] debtor or any creditor may file a complaint to obtain a determination of

56

the dischargeability of any debt." And under Fed. R. Bankr. P. 4007(b), such a complaint "may be filed at any time."[43] It may even be filed after the bankruptcy case has been closed, which would mean, in most cases, after a bankruptcy discharge has been issued. If the bankruptcy case has been closed, Rule 4007(b) says that "[a] case may be reopened without payment of an additional filing fee for the purpose of filing a complaint to obtain a determination [of dischargeability] under this rule."

For these reasons, the maximum amount of monetary relief Plaintiff likely can obtain, if Plaintiff prevails on the dischargeability issues after a trial in this case, would be the reasonable attorney fees and expenses incurred in moving Shelley's claim from state court to this Court, by filing this adversary proceeding. With this now being the only thing left at stake in this case, the Court concludes that it does not make sense to allow and force the parties to incur the additional, future expense of a trial. For Plaintiff, such additional future fees and expenses likely would exceed substantially the maximum amount of monetary relief Plaintiff could recover, if Plaintiff succeeds, after trial, in showing that Scott's debt to Shelley was in fact discharged in Scott's bankruptcy case.

No doubt Plaintiff hoped to prevail on the dischargeability issue at the summary judgment stage. But now that he has not done so, a trial is necessary to determine that issue. Under the circumstances, and for the reasons discussed above, the Court is exercising its discretion by deciding, now, that the Court will not award Plaintiff any monetary or injunctive relief even if

---

[43] The only exception to the rule that a complaint to determine dischargeability "may be filed at any time" is for a complaint under Bankruptcy Code § 523(c). Complaints covered by § 523(c) are subject to a deadline prescribed by Fed. R. Bankr. P. 4007(c). But § 523(c) applies only to actions based on §§ 523(a)(2), 523(a)(4), and 523(a)(6). *See* 11 U.S.C. § 523(c)(1).

57

Plaintiff were to establish at trial that Shelley violated the discharge injunction. The Court therefore will dismiss Counts IV and V of Plaintiff's first amended complaint, and will dismiss that part of Count II of Plaintiff's First amended complaint that remains after the Court's entry of partial summary judgment for Plaintiff on that count, as described in Part V.B of this Opinion.

## VI. Conclusion

For the reasons stated in this Opinion, the Court will enter an order ruling on the parties' motions, as described in this Opinion.

**Signed on September 18, 2018**

/s/ **Thomas J. Tucker**
**Thomas J. Tucker**
**United States Bankruptcy Judge**